Willie M. BROWN; David S. Bagley; Joan Bagley; Orris Cross; Russell Anderson, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

United States of America, Intervenor,

v.

## NORTH CAROLINA DIVISION OF MOTOR VEHICLES, Defendant–Appellee.

### No. 97–2784.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 26, 1998.

Decided Feb. 12, 1999.

**ARGUED:** Seth Michael Galanter, United States Department of Justice, Washington, D.C., for Intervenor. Stephen Russell Senn, Peterson & Meyers, P.A., Lakeland, Florida, for Appellants. James Peeler Smith, Special Deputy Attorney General,

North Carolina Department of Justice, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Bill Lann Lee, Acting Assistant Attorney General, Jessica Dunsay Silver, United States Department of Justice, Washington, D.C., for Intervenor. J. Davis Connor, Peterson & Meyers, P.A., Lakeland, Florida; Robert Joseph Antonello, Robert G. Fegers, Antonello & Fegers, Winter Haven, Florida; Melinda Lawrence, Burton Craige, Leto Copeley, Patterson, Harkavy & Lawrence, L.L.P., Raleigh, North Carolina, for Appellants. Michael F. Easley, North Carolina Attorney General, Hal F. Askins, Special Deputy Attorney General, C. Norman Young, Assistant Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee.

Before WILKINSON, Chief Judge, MURNAGHAN, Circuit Judge, and MOON, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Chief Judge WILKINSON wrote the majority opinion, in which Judge MOON joined. Judge MURNAGHAN wrote a dissenting opinion.

## OPINION

WILKINSON, Chief Judge:

Five purchasers of North Carolina handicapped parking placards sued the state Division of Motor Vehicles (DMV) on behalf of themselves and all those similarly situated to recover a five dollar fee the state charged for the placard. Plaintiffs claimed the fee violated 28 C.F.R. § 35.130(f), promulgated under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12134. That regulation prohibits public entities from charging a fee to cover the costs of accessibility programs designed to assist the disabled.

The district court found that in passing the ADA, Congress exceeded its powers under Section 5 of the Fourteenth Amendment, and thus Congress could not abrogate sovereign immunity under the test set forth in *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Because we find that under *City of Boerne v. Flores*, 521

U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), 28 C.F.R. § 35.130(f) exceeds Congress' Section 5 powers, we affirm the district court's dismissal of this suit for want of subject matter jurisdiction.

### I.

Since 1972 the state of North Carolina has provided a system of handicapped parking for its disabled citizens. *See* An Act to Provide Special Parking Privileges for Disabled Persons, ch. 374, 1971 N.C. Sess. Laws 305. The state has continuously maintained and updated that system in the ensuing decades. *See, e.g.,* An Act to Clarify the Law Pertaining to Parking Privileges for the Handicapped, ch. 632, 1979 N.C. Sess. Laws 662; An Act to Provide for the Enforceable Designation of Handicapped Parking Signs, ch. 843, 1987 N.C. Sess. Laws 2031. The current system allows persons with mobility impairments to obtain special license plates and removable windshield placards. N.C. Gen. Stat. § 20–37.6(b) & (c). These plates and placards permit the holder to park in any parking space reserved for handicapped persons. *Id.* § 20–37.6(a). To receive a placard, an applicant must provide medical certification of mobility impairment. *Id.* § 20–37.6(c1). The placard is valid for five years and is renewable. *Id.*

North Carolina law further provides that the DMV "may charge a fee sufficient to pay the actual cost of issuance, but in no event less than five dollars ($5.00) per placard." *Id.* § 20–37.6(c). In accordance with this provision, the DMV charges five dollars for the placard—a fee equal to one dollar a year—to recover the costs of administering the program. From 1990 to 1996, the DMV issued some 573,450 parking placards to assist its citizens with disabilities.

Nearly twenty years after North Carolina began providing for handicapped parking, Congress passed the Americans with Disabilities Act, Pub.L. No. 101–336, 104 Stat. 327 (1990). Title II of the ADA requires that no disabled person, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42

U.S.C. § 12132. Title II delegates authority to the Attorney General to promulgate implementing regulations within one year after the ADA's effective date. *Id.* § 12134. Pursuant to that grant, the Department of Justice promulgated rules requiring the creation of handicapped accessible parking spaces. 28 C.F.R. §§ 35.150–.151; *id.* pt. 36, app. A; *see also id.* § 36.304. The Department's regulations further require that

> A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

*Id.* § 35.130(f).

Appellants are persons with disabilities who paid a five dollar fee to the DMV to receive a placard. On August 7, 1996, they filed suit in the Eastern District of North Carolina challenging, on behalf of themselves and all others similarly situated, the legality of the fee under 28 C.F.R. § 35.130(f). Appellants sought a declaration that the fee was unlawful and an injunction against its continued imposition. They also requested the repayment with interest of all fees illegally charged. The DMV interposed Eleventh Amendment sovereign immunity. In response, appellants argued that Congress, acting pursuant to Section 5 of the Fourteenth Amendment, abrogated that immunity when it passed the ADA. Neither party argued that the regulation was *ultra vires.*

The district court held that the Eleventh Amendment barred this suit. *Brown v. North Carolina Div. of Motor Vehicles,* 987 F.Supp. 451 (E.D.N.C.1997). The court found that Congress clearly intended to abrogate state sovereign immunity. *Id.* at 454–55. Nevertheless, the court held that Congress could not do so because Title II of the ADA exceeded its remedial power under Section 5 of the Fourteenth Amendment. First, the court held that the ADA impermissibly mandated that disabled individuals were entitled to heightened scrutiny under the Equal Protection Clause of the Fourteenth Amend-

ment. *Id.* at 457–458. Second, the district court stated that the ADA was not remedial legislation at all, but instead created an entitlement for the especial advantage of disabled citizens. *Id.* at 458–59. Finding that Congress therefore failed to properly abrogate Eleventh Amendment immunity, the district court dismissed the suit for lack of subject matter jurisdiction. The placard holders appeal, and the United States has intervened.

## II.

### A.

The Eleventh Amendment provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although the text of the Amendment seems to restrict only the scope of diversity jurisdiction in federal court, the Amendment has long been interpreted to contain much broader limitations. In *Hans v. Louisiana,* the Supreme Court recognized that the "suability of a State without its consent" was "not contemplated by the Constitution when establishing the judicial power of the United States." 134 U.S. 1, 15, 16, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Since that time, the Court has reaffirmed this important principle of federalism embodied in the Eleventh Amendment. *See Seminole Tribe,* 517 U.S. at 54 n. 7, 116 S.Ct. 1114 (listing cases); *Booth v. Maryland,* 112 F.3d 139, 141–42 (4th Cir.1997) (reviewing the case law). State sovereign immunity includes the proposition that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

The Supreme Court has held that Congress has a limited power to abrogate immunity. *See, e.g., Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Congressional abrogation of immunity must meet two requirements: Congress must "unequivocally

express[ ] its intent to abrogate the immunity," and Congress must act "pursuant to a valid exercise of power." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *accord Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. 1114.

■ To determine whether Congress has acted pursuant to a valid exercise of power, a court must ask, "Was the Act in question passed pursuant to a constitutional provision granting Congress the power to abrogate?" *Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. 1114. This inquiry itself has two components. First, the congressional action must be taken pursuant to a provision that entails the power to abrogate. For example, in *Seminole Tribe,* the Court held that Congress' Article I authority to regulate interstate and Indian commerce does not include the power to abrogate a state's Eleventh Amendment immunity. *Id.* at 59–73, 116 S.Ct. 1114; *see also In re Creative Goldsmiths of Washington, D.C., Inc.,* 119 F.3d 1140, 1145 (4th Cir.1997) (noting that "Congress' powers under Article I cannot be construed to empower it to expand federal jurisdiction by abrogating the states' sovereign immunities"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). The Fourteenth Amendment, on the other hand, does include the power to abrogate—the Supreme Court has held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick,* 427 U.S. at 456, 96 S.Ct. 2666 (citation omitted).

■ Second, the statute seeking to abrogate immunity must be constitutional. In the context of a purported exercise of the Section 5 power, this requirement means that a court must ensure that Congress was actually "acting pursuant to § 5 of the Fourteenth Amendment." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). If the scheme at issue exceeds the Section 5 power, it is without jurisdictional effect and cannot constitutionally abrogate immunity. *See Autio v. AFSCME, Local 3139,* 140 F.3d 802, 804–06 (8th Cir.1998)(deciding constitutionality of congressional enactment in determining whether immunity was abrogated), *aff'd by an equally divided court,* 157 F.3d 1141 (8th Cir.1998) (en banc); *Coolbaugh v. Louisiana,* 136 F.3d 430, 433–38 (5th Cir.1998) (same), *cert. denied,* —— U.S. ——, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Clark v. California,* 123 F.3d 1267, 1270–71 (9th Cir.1997) (same), *cert. denied,* —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998). In examining whether Congress abrogated Eleventh Amendment immunity, a court must "be able to discern some legislative purpose or factual predicate that supports the exercise of [the Section 5 power]. That does not mean, however, that Congress need anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection'...." *EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). But the law must be supportable under Section 5 to be a valid exercise of power and effect an abrogation of state sovereign immunity.

### B.

■ The parties disagree over what this review for constitutionality entails. The United States as intervenor argues that in reviewing a scheme purporting to abrogate state sovereign immunity, courts are to look broadly at the entire statutory framework—here Title II of the ADA—and ratify its constitutionality without looking at the validity of its individual provisions or the agency regulations promulgated under its authority. The government urges this court to examine the scheme *in toto* to see generally whether it is an effort to rectify discrimination that some group has suffered in the past. *See, e.g., Clark,* 123 F.3d at 1270 (holding the ADA to be a valid exercise of power after noting the connection between its antidiscriminatory aim and past discrimination). Because Title II encompasses such a general antidiscriminatory purpose, the government would have us go no further.

We disagree. To begin with, the broadbrush review proposed by the government requires courts to ratify unnecessarily the constitutionality of every provision in the title. "If there is one doctrine more deeply rooted than any other in the process of con-

stitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 104, 65 S.Ct. 152, 89 L.Ed. 101 (1944); *see also Ashwander v. TVA,* 297 U.S. 288, 345–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Even if such a look is preliminary and cursory, its breadth is fundamentally at odds with separation of powers values.

Additionally, broad-look review raises difficult questions of administrability. In conducting that review, what is a court to do when it finds parts of a title constitutional and other parts unconstitutional? The temptation, of course, is to depart from broad-brush review in those cases and look specifically at the particular provision whose alleged violation gave rise to the lawsuit. But that leads to results that are no different from those obtained by examining the specific statute in the first instance.

■ Most importantly, the broad-look review urged upon us by the government glosses over the crucial federalism concerns that animate the Eleventh Amendment. Because the "abrogation of sovereign immunity upsets 'the fundamental constitutional balance between the Federal Government and the States,'" *Dellmuth v. Muth,* 491 U.S. 223, 227, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (quoting *Scanlon,* 473 U.S. at 238, 105 S.Ct. 3142), courts must exercise great care before finding abrogation. "A State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99 (1984) (emphasis omitted). "Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system." *Id.* For that reason, the Supreme Court has consistently erected hurdles to a finding that Eleventh Amendment immunity does not bar suit. *See, e.g., Edelman,* 415 U.S. at 673, 94 S.Ct. 1347 (requiring express language or overwhelming implication before finding waiver); *Scanlon,* 473 U.S. at 243, 105 S.Ct. 3142 (requiring an unequivocal textual expression of congressional intent before finding abrogation).

Looking broadly at an entire title would leave under protected these important state interests in immunity. Ratifying an entire title and finding abrogation without examining the actual, specific legal basis for suit could subject a state to suit in federal court pursuant to an unconstitutional provision buried in the midst of an otherwise constitutional statutory scheme. Such a jurisprudence—one leading to sweeping validations of abrogation—would be completely discordant with the doctrine of dual sovereignty.

Moreover, sovereign immunity analysis in cases brought to enforce an agency regulation ought not end with the authorizing statute. Reviewing only the statute at issue—and ignoring the regulation whose alleged violation by the state gave rise to the action—would lead to the abrogation of immunity in cases even where the agency rule was unconstitutional or beyond the bounds of delegated authority. This is so because the statute itself—which may speak only in general terms—may be facially constitutional, despite the fact that the regulations promulgated under it are unconstitutional. Whether Congress acts directly in the form of a detailed statutory framework or whether it acts indirectly by broadly delegating to an agency the authority to promulgate detailed regulations is without import for Eleventh Amendment immunity. Focusing only upon the statute and ignoring the regulation would artificially hinge the weighty structural protections of state sovereign immunity upon a congressional choice of rulemaking efficacy.

■ Nor do the safeguards of federalism wither in the face of an overzealous bureaucracy intent upon imposing its will on the states. Regulations that unjustifiably intrude "into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens," *Boerne,* 117 S.Ct. at 2171, are invalid exercises of power. Just as the Eleventh Amendment does not leave states without a shield when they confront congressional acts, states are not rendered defenseless in their duels with government by bureaucracy.

Reasons of separation of powers, administrability, and federalism thus dictate a searching review of the legal basis for suit. In determining whether Eleventh Amendment immunity is abrogated in a case involving a regulation, we first ask whether Congress intended to abrogate immunity. Then, in determining whether it was acting pursuant to a valid exercise of power, we examine the legality of the specific statute and regulation whose asserted violation by state government gave rise to the claim for relief in federal court.

### III.

We now proceed to apply this immunity test to this case. Appellee, as a department of the state, is immune from suit unless Congress has abrogated that immunity. *See Pennhurst,* 465 U.S. at 100, 104 S.Ct. 900. No party to this case contests that the first prong of the abrogation analysis is met. In passing the ADA, Congress made it "unmistakably clear" that it intended to abrogate sovereign immunity. *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment ...from an action in Federal or State court of competent jurisdiction for a violation of this chapter.").

The question remains, therefore, whether the statute and regulation at issue were adopted pursuant to a valid exercise of congressional power. In passing the ADA, Congress made clear that it was invoking its powers under Section 5 of the Fourteenth Amendment. The ADA lists among its purposes "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment..., in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). The mere invocation of the Section 5 power, however, is not dispositive. To abrogate, the statute and regulation must also be constitutional exercises of that power. Here, we hold that 28 C.F.R. § 35.130(f), which prohibits a state from charging even a modest fee to recover the costs of its efforts to aid the handicapped, lies beyond the remedial scope of the Section 5 power. As such, it is not a constitutionally

valid exercise of power, and the effort to abrogate must fail.

### A.

Section 5 of the Fourteenth Amendment provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Included in that article, of course, is the Equal Protection Clause. The Supreme Court in *City of Boerne v. Flores* held that "Congress' power under § 5, however, extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment.... The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States." 117 S.Ct. at 2164. In other words, Congress has the power to remedy violations of constitutional rights, not to define the substance of those rights.

But the line between remedial and definitional exercises of the Section 5 power is often a fine one and "Congress must have wide latitude in determining where it lies." *Id.* "[Section] 5 is a positive grant of legislative power," *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), and courts owe substantial deference to Congress when it seeks to remedy constitutional violations. Congress not only has the power to craft remedies that draw constitutional violations within their ambit, it also has the power to act prophylactically in response to persistent and pervasive constitutional violations. *See Boerne,* 117 S.Ct. at 2167. "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional...." *Id.* at 2163.

Despite these broad powers, "the power granted to Congress was not intended to strip the States of their power to govern themselves or to convert our national government of enumerated powers into a central government of unrestrained authority over every inch of the whole Nation." *Oregon v. Mitchell,* 400 U.S. 112, 128, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (opinion of Black, J.); *see*

*also Creative Goldsmiths,* 119 F.3d at 1146 ("[Section] 5 of the Fourteenth Amendment does not grant Congress a plenary power."). Section 5's own text suggests limitations which protect the federal balance: Congress may "enforce, by appropriate legislation." The yardstick used to measure whether an exercise of the congressional enforcement power is "appropriate" —that is, whether it is remedial and not definitional—was set forth in *Boerne:* "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." 117 S.Ct. at 2164. The end targeted must be "constitutional violations" or laws many of which "have a significant likelihood of being unconstitutional." *Id.* at 2163, 2170. And the means employed must be congruent and proportional to any such violation. Unless the enactment is tailored to remedy particular constitutional violations, Congress lacks the power to invade the "legislative spheres of autonomy previously reserved to the States." *Fitzpatrick,* 427 U.S. at 455, 96 S.Ct. 2666.

## B.

Applying the congruence and proportionality test, appellant argues that 28 C.F.R. § 35.130(f) is entirely constitutional because it seeks only to enforce the Equal Protection Clause's ban on laws motivated by arbitrary and irrational discrimination. Appellant urges that in passing the ADA Congress found widespread discrimination and prejudice against individuals with disabilities. Congress noted that those individuals suffer from "stereotypic assumptions not truly indicative of . . . individual ability" and from discrimination "in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a). Congress concluded that disabled persons "occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." *Id.* The United States as intervenor adds that the regulation is congruent and proportional because it seeks to prevent those laws most likely to be the result of invidious discrimination.

■ We disagree. Under *Boerne,* Section 5 enactments must target unconstitutional state action. The Constitution, however, has given state governments significant latitude in dealing with problems of disability. In *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court held that classifications made on the basis of mental retardation need only satisfy a standard of rational basis review. The Court rejected the suggestion that mental retardation is a quasi-suspect classification, stating that "the distinctive legislative response, *both national and state,* to the plight of those who are mentally retarded demonstrates not only that they have unique problems, but also that the lawmakers have been addressing their difficulties in a manner that belies a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary." *Id.* at 443, 105 S.Ct. 3249 (emphasis added). The Court further noted that this "legislative response, which could hardly have occurred and survived without public support, negates any claim that the mentally retarded are politically powerless." *Id.* at 445, 105 S.Ct. 3249. Rational basis review thus "affords government the latitude necessary both to pursue policies designed to assist the retarded in realizing their full potential, and to freely and efficiently engage in activities that burden the retarded in what is essentially an incidental manner." *Id.* at 446, 105 S.Ct. 3249. Given the Supreme Court's rationale, we cannot extend to the physically disabled a different standard of protection from that given to the mentally disabled. *Accord Autio,* 140 F.3d at 806 (noting that disability classifications are not entitled to heightened scrutiny); *Coolbaugh,* 136 F.3d at 433 n.1 (same); *Clark,* 123 F.3d at 1270 (same). The constitutionality of state laws affecting the disabled must thus be measured by rational basis review.

■ It is true, of course, that even rational basis review places limitations on states that Congress may seek to enforce. Irrational classifications or laws motivated by the desire to harm an unpopular group fail rational basis scrutiny. *Bankers Life & Cas.*

Co v. Crenshaw, 486 U.S. 71, 83, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review."); see also Romer v. Evans, 517 U.S. 620, 634–35, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); Cleburne, 473 U.S. at 446–47, 105 S.Ct. 3249. Thus, the validity of 28 C.F.R. § 35.130(f) turns in part upon whether Congress sought to remedy a specific unconstitutional state of affairs; that is, whether the end targeted was arbitrary state action or state action motivated by animus.

In passing the ADA, Congress did make substantial findings about many forms of discrimination against the disabled in American life. 42 U.S.C. § 12101(a). But general findings of discrimination alone, as regrettable and unfortunate as that state of affairs may be, do not justify denying state governments the basic ability to provide for their own citizens' health and welfare. Instead, Congress can intrude upon state prerogatives only when seeking to remedy or prevent particular constitutional violations. The Supreme Court has explained that Section 5 legislation will be upheld where it "rest[s] on unconstitutional discrimination by [a state] and Congress' reasonable attempt to combat it." Boerne, 117 S.Ct. at 2168. Animus "in the air," however, does not permit Congress to effect a wholesale redistribution of power between the states and the central government.

Here Congress, through the Attorney General, acted to ban state surcharges designed to recover the costs of programs provided for the benefit of disabled persons. Such an act is only sustainable under the Section 5 power if many of those surcharges "have a significant likelihood of being unconstitutional." Id. at 2170. In view of the efforts of states to assist the handicapped, including the admirable efforts of North Carolina which are at issue here, that likelihood is not apparent to this court. Nor has any party pointed us to any support in the legislative record for the proposition that state surcharges for handicapped programs are motivated by animus toward the class. It may well be that some subset of those surcharges is in fact so motivated. But on the record before us, we can only believe that most fees are like that imposed by North Carolina law—a modest cost-recovery mechanism rationally employed to recoup the costs of programs aimed at assisting persons with disabilities. Such a fee is rationally based and perfectly constitutional under Cleburne.

Admittedly, Congress may act prophylactically if it faces a "subsisting and pervasive discriminatory—and therefore unconstitutional—use of" surcharges. Id. at 2167. But the prophylactic measures must still be congruent and proportional to the underlying unconstitutional state action. Section 35.130(f), like the statute at issue in Boerne, is not so tailored. The restrictions imposed by 28 C.F.R. § 35.130(f) "apply to every agency and official of the ... State[ ] and local Governments. [The regulation] applies to all ... state law, statutory or otherwise, whether adopted before or after its enactment. [It] has no termination date or termination mechanism. Any [surcharge] is subject to challenge at any time by any individual" with a disability. Id. at 2170 (citations omitted). Section 35.130(f) "is so out of proportion to a supposed remedial or preventative object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. Absent such congruence and proportionality, section 35.130(f) is best understood as definitional, not remedial, and therefore is beyond Congress' power under Section 5.

By imposing a ban on all surcharges, the regulations are definitional in an even more fundamental way. They attempt to create a positive entitlement to a free handicapped parking space. While such an undertaking may be commendable, it is a function of the state police power; nothing in the Constitution requires it. And federal regulations imposing it—when not congruent and proportional to unconstitutional state action—seek to redefine the Equal Protection Clause, transforming it from a prohibition on invidious state action into a charter of positive rights. Such a step, however, is beyond the scope of the Fourteenth Amendment. See Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (declining to find a

right to "decent, safe, and sanitary housing" in the Equal Protection Clause).

Our holding that Congress, through the Attorney General, acted definitionally is reinforced by evidence in the statutory scheme itself. A congressional attempt to redefine the holding of *Cleburne* abounds. For example, in *Cleburne*, the Supreme Court declared that the mentally disabled were a "large and diversified group" and "doubt[ed] that the predicate for [heightened scrutiny] is present." *Cleburne*, 473 U.S. at 442–43, 105 S.Ct. 3249. The ADA, by contrast, specifically takes issue with the Court's definitional choice and declares that "individuals with disabilities are a discrete and insular minority." 42 U.S.C. § 12101(a)(7). This declaration evinces an intent not to remedy violations of the standard of *Cleburne*, but rather to effect a "substantive alteration of its holding." *Boerne*, 117 S.Ct. at 2171. In striking state legislation that is clearly rationally grounded, Congress sought to do what *Cleburne* said it may not do—establish a new suspect or quasi-suspect equal protection classification.

## IV.

The facts of this case demonstrate how far the structure of dual sovereignty has been distorted. North Carolina has maintained a long-standing program designed to benefit disabled persons through the provision of special parking spaces. In order to make the program effective, the state undertook to provide placards to those who were eligible to use the spaces. To cover the cost of the placards, North Carolina introduced the most modest of all possible fees—one dollar a year. A federal agency now seeks to deny the state even that meager option in administering the state's voluntary enforcement efforts. The United States further insists that the state may be called to answer for this alleged transgression in federal court. We hold, however, that the Eleventh Amendment forbids this course. To interpret Section 5 to

abrogate the state's immunity would be a mark of profound constitutional disrespect to the role that states are meant to play within our federal system.* The judgment of the district court is hereby

*AFFIRMED.*

MURNAGHAN, Circuit Judge, dissenting:

Because I believe that the ADA provision is a reasonable and valid exercise of Congress' powers pursuant to Section 5 of the Fourteenth Amendment, I respectfully dissent.

The majority opinion has detailed the applicable law with respect to Congress' ability to abrogate the states' sovereign immunity, and I need not recount that in great detail here. However, I question the majority's application of that law to 28 C.F.R. § 35.130(f).

First, I note that there is absolutely no basis to conclude that § 35.130(f) is anything like the now discredited RFRA. Unlike RFRA, the provisions of which applied to "laws ... [and] official actions of almost every description and regardless of subject matter," *see Boerne*, 117 S.Ct. at 2170, § 35.130(f) by its terms applies only to a certain class of laws (laws authorizing fees or surcharges) that in turn apply only to a certain class of people (the disabled). *See* 28 C.F.R. § 35.130(f). Moreover, by its terms § 35.130(f) only ‚applies to surcharges imposed on the disabled to cover the cost of measures taken "to provide that [disabled] individual or group with the nondiscriminatory treatment required by this Act or this part." *Id.* All § 35.130(f) really stands for, then, is the unspectacular proposition that a state may not recover from victims of discrimination the cost of ending discrimination against those victims. The very terms of the regulation provide for no more than that.

Second, it troubles me to reach the notion that Congress cannot protect the disabled from discrimination because of the deferential rational basis standard of review accord-

---

* Deciding this case on the basis of the constitutionality of 28 C.F.R. § 35.130(f), we need not pass on 42 U.S.C. § 12132 itself. And, holding that this case was rightfully dismissed for lack of jurisdiction, we do not reach the question whether 28 C.F.R. § 35.130(f) is a constitutional exercise of an Article I enumerated power. These and other issues remain if this matter is refiled in a state court with subject matter jurisdiction.

ed to state legislation. *See Clark,* 123 F.3d at 1271 (concluding that the standard of review to which state legislation is subjected should not define Congress' boundaries for its enforcement powers under § 5). When Congress finds that invidious discrimination has plagued a class of people, it may act to ensure that the class receives equal protection under the law. *See* Amend XIV, § 5; *Ex parte Virginia,* 100 U.S. at 345–46. Congress has some discretion in how it chooses to respond to the problem, since "[a]s a general matter, it is for Congress to determine the method by which it will reach a decision." *Boerne,* 117 S.Ct. at 2170.

As the Supreme Court made clear in *Cleburne,* the disabled, while not considered a suspect class, may not be subjected to arbitrary and invidious discrimination. *See* 473 U.S. at 446–47, 105 S.Ct. 3249. Here, Congress has made substantial findings that the disabled are subjected to just that type of discrimination in numerous arenas. *See* 42 U.S.C. § 12101 (1990). In response to that discrimination, Congress enacted the ADA, which has been found constitutional by all circuits that have reviewed it. *See Clark,* 123 F.3d at 1270–71 (9th Cir.1997); *Coolbaugh,* 136 F.3d at 438 (5th Circuit); *Autio,* 140 F.3d at 806, *aff'd by an equally divided court,* 157 F.3d 1141 (8th Cir.1998). The regulation at issue here, which was promulgated by the Department of Justice pursuant to the ADA, merely ensures that the costs of correcting the wrongs inflicted upon the disabled will be borne by the wrongdoer (the state) rather than the victim (the disabled individual or group). Therefore, § 35.130(f) does not expand the rights of the disabled, but merely prevents a state from adding insult to injury by making the disabled pay for the correction of the injuries inflicted over the years.

Finally, § 35.130(f) does not purport to provide the disabled with a "free" parking space. What few comments the Department of Justice made regarding § 35.130(f) indicate that the measure was only designed to cover surcharges for services that the state was under an obligation to provide. *See* 28 C.F.R. Pt. 35, App. A (1998). The brief comments discussing § 35.130(f) relate to a

request for clarification of the ability to charge for courtroom interpreters. *See id.* In response to the request, the Department adopted the standard set forth in its regulations pursuant to § 504 of The Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West Supp. 1998), and stated that where the court system is obligated to provide an interpreter, it cannot charge the litigant. *See* 28 C.F.R. Pt. 35, App. A. The import of that statement is clear: where there is no obligation to provide an interpreter (or any other service), the state is under no obligation to pay for it.

The comments accompanying an identical provision in the ADA regulations applicable to public accommodations make it even clearer that the bans on surcharges found in the regulations were not intended to be broad-based bans on all surcharges applicable to the disabled but merely limited tools to help facilitate the remedial aims of the ADA. *See* 28 C.F.R. Pt. 36, App. B (1998). Like § 35.130(f), 28 C.F.R. § 36.302(c)(1998) prohibits an entity (public accommodations here) from "impos[ing] a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures … that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part." *Id.* The Department notes that it was asked whether daycare centers could charge fees for services rendered in addition to those required by the ADA, and it made clear that 28 C.F.R. § 36.302(c) "is intended only to prohibit charges for measures necessary to achieve compliance with the ADA." 28 C.F.R. Pt.36, App. B. Therefore, the bans on surcharges embodied in § 35.130(f) and like provisions are not intended to redefine the rights of the disabled by guaranteeing them free access to services but are remedial measures designed to ensure that the disabled are not charged for services required to provide them with the level of treatment accorded to nondisabled persons.

Viewed in its proper light, § 35.130(f) not only is constitutional, but merely states expressly that which is intuitive. It makes no more sense to allow states to recoup from the disabled the costs of providing the remedial programs needed to fully integrate them into

society than it would, for example, to permit universities receiving federal funding to charge women higher tuition rates to cover the costs of complying with Title IX of the Civil Rights Act of 1964. The goal is to help the victims of discrimination, not to heap more discriminatory treatment upon them. Therefore, I would reverse the district court's decision that it lacked subject matter jurisdiction to hear the claim.