**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DWAYNE E. WESSEL,
                    *Plaintiff-Appellant,*

UNITED STATES OF AMERICA,
                    *Intervenor,*

            and

WINSTON LLOYD,
                            *Plaintiff,*

            v.

PARRIS N. GLENDENING, Governor,
Sued in his official and individual
capacity; STUART O. SIMMS,
Secretary, Sued in his official and
individual capacity; WILLIAM W.
SONDERVAN, Ed.D., Commissioner,
Sued in his official and individual
capacity; PATRICIA CUSHWA,
Chairperson, Sued in her official
and individual capacity; MACEO
WILLIAMS, Commissioner, Sued in
his official and individual capacity;
FRANK PAPPAS, Commissioner, Sued
in his official and individual
capacity; ALEXANDER FRANCIS,
Warden, Sued in his official and
individual capacity; SANDRA BOOSE,
Facility Administrator, Sued in her
official and individual capacity;

No. 00-6634

SERGEANT DORN, Sued in his
individual capacity,
                    *Defendants-Appellees,*

                    and

DISABILITY RIGHTS SECTION, Civil
Rights Division, United States
Department of Justice, Sued in its
official capacity,
                    *Defendant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Chief District Judge.
(CA-99-3158-S)

Argued: June 5, 2002

Decided: September 26, 2002

Before WILKINS, TRAXLER, and KING, Circuit Judges.

Affirmed by published opinion. Judge Wilkins wrote the majority
opinion, in which Judge Traxler joined. Judge King wrote a dissenting
opinion.

## COUNSEL

**ARGUED:** Neal Lawrence Walters, UNIVERSITY OF VIRGINIA
SCHOOL OF LAW APPELLATE LITIGATION CLINIC, Char-
lottesville, Virginia, for Appellant. Kevin Kendrick Russell, Appellate
Section, Civil Rights Division, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Intervenor. David Phelps Ken-
nedy, Assistant Attorney General, Baltimore, Maryland, for Appel-

lees. **ON BRIEF:** Ralph F. Boyd, Jr., Assistant Attorney General, Jessica Dunsay Silver, Seth M. Galanter, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellees.

---

## OPINION

WILKINS, Circuit Judge:

Dwayne E. Wessel brought this action pursuant to Part A of Title II of the Americans with Disabilities Act (ADA) of 1990, *see* 42 U.S.C.A. §§ 12131-12134 (West 1995).[1] The district court dismissed the action, concluding that Wessel's claim was barred by the State's sovereign immunity under the Eleventh Amendment to the United States Constitution. We affirm.

### I.

In March 1999, Wessel was committed to the custody of the Maryland Division of Corrections. Under Maryland law, all inmates are awarded a certain number of good conduct credits at the outset of their sentences; inmates can earn additional credits by participating in institutional work or education programs, or by participating in special projects. Completing a "boot camp" program is one way to earn special project credits.

Upon his incarceration, Wessel was assigned to a boot camp program, but he was deemed medically unqualified for the program and was transferred to another correctional facility shortly thereafter. He was then offered employment as a yard worker but was disqualified when he told prison officials that his feet hurt and that he could not do the work. Subsequently, Wessel was placed on non-work status and transferred to the Jessup Pre-Release Unit (Jessup).

---

[1]Wessel named Parris N. Glendening, Governor of the State of Maryland, and numerous other state officials as defendants. We refer to these individuals collectively as "the State."

Wessel filed this action pro se while incarcerated at Jessup, claiming that the State violated his rights under the ADA by failing to provide him, as a disabled inmate, with opportunities to earn diminution credits on an equal basis with non-disabled inmates.[2] *See* 42 U.S.C.A. § 12132 (providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity"). The district court dismissed the action upon the State's motion, holding that Congress, in enacting Title II of the ADA, did not validly abrogate the states' Eleventh Amendment immunity from suits for damages.[3]

Wessel appealed pro se, and we appointed counsel and calendared the case for oral argument. The United States intervened pursuant to 28 U.S.C.A. § 2403(a) (West 1994) and filed a brief and presented argument in support of the validity of abrogation.

II.

The Eleventh Amendment prohibits the extension of "[t]he Judicial power of the United States" to "any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the text of the Eleventh Amendment does not address suits for damages against an unconsenting state by its own citizens, it is well settled that "an unconsenting State is immune from

---

[2]Wessel also maintained that the State's conduct violated his rights under the Equal Protection Clause of the Fourteenth Amendment. We affirm the dismissal of this claim without further discussion.

[3]Although the State did not raise this as a basis for dismissal, in this appeal it supports the holding of the district court. There is no dispute that the Eleventh Amendment issue is properly before us. *See Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 467 (1945) ("The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue . . . even though urged for the first time in this Court.").

suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).[4]

Congress may abrogate immunity under certain circumstances. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996). Determining whether Congress has done so requires a court to consider two questions: first, "whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity'; and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Id.* (alteration in original) (citation omitted) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)). Whether Congress has abrogated the states' sovereign immunity is a legal question, and as such is subject to de novo review, *see United States v. Martin*, 215 F.3d 470, 472 (4th Cir. 2000).

### A.

Before conducting the abrogation analysis, we first address the scope of our analysis. The Government, relying on our decision in *Brown v. North Carolina Division of Motor Vehicles*, 166 F.3d 698 (4th Cir. 1999), asserts that our consideration of the abrogation question should be limited to the particular context of this litigation, *i.e.*, the application of Title II to state prisons. We conclude that the rule announced in *Brown*, which requires a court to consider the narrowest form of the constitutional question presented, does not apply here in the manner suggested by the Government.[5]

In *Brown*, a class of disabled individuals challenged a fee charged by North Carolina for the issuance of handicapped parking placards, maintaining that the fee violated a regulation promulgated pursuant to Title II. This court concluded that when "determining whether Eleventh Amendment immunity is abrogated in a case involving a regulation," a court should "examine the legality [only] of the specific

---

[4]The protection of the Eleventh Amendment does not extend to suits seeking injunctive relief from state officials pursuant to *Ex Parte Young*, 209 U.S. 123 (1908). *See Edelman*, 415 U.S. at 664. Because Wessel is no longer in state custody, no injunctive relief is available to him.

[5]We do apply the rule in *Brown* to the extent of limiting our abrogation analysis to Part A of Title II, 42 U.S.C.A. §§ 12131-12134.

statute and regulation whose asserted violation by state government gave rise to the claim for relief in federal court." *Id.* at 705.

The State urges us to hold that *Brown* was effectively overruled by *Board of Trustees v. Garrett*, 531 U.S. 356 (2001), which held that Congress did not validly abrogate sovereign immunity when it enacted Title I of the ADA. We conclude, however, that the rule in *Brown*, which was adopted in the context of litigation challenging a particular regulation, does not apply here, where the claim arises directly under Title II. The mere fact that this litigation concerns Title II itself, and not a regulation, is alone adequate to establish the inapplicability of *Brown*. As discussed above, in *Brown* we admonished that abrogation review should focus on the narrowest provision on which liability may be based. Here, that provision is Title II. What the Government proposes is not limiting our abrogation analysis to a particular provision, but rather to a particular defendant. This is not an application of *Brown*; it is an extension of it. Moreover, such an extension is contraindicated by the language of *Brown*. The regulation challenged there prohibited all public entities from levying surcharges to cover the cost of compliance with the ADA, and we conducted the abrogation analysis in precisely those terms, rather than limiting our inquiry to surcharges imposed by state motor vehicle departments. *See Brown*, 166 F.3d at 707 (noting lack of congressional record regarding unconstitutional state surcharges for handicapped programs).

We further conclude that it would be improper to extend *Brown* as the Government would have us do. Title II prohibits discrimination by any "public entity." 42 U.S.C.A. § 12132. The term "public entity" is defined to include states. *See id.* § 12131(1)(A). Significantly, nowhere does Title II specifically name prisons or any other arm of the state. Thus, absent judicial redrafting of the statute, there is no narrower constitutional question to address. *Cf. United States v. Albertini*, 472 U.S. 675, 680 (1985) ("Statutes should be construed to avoid constitutional questions, but this interpretive canon is not a license for the judiciary to rewrite language enacted by the legislature.").

## B.

Having concluded that we must conduct the abrogation analysis as to the whole of Part A of Title II, we now turn to consideration of that

issue. The question of whether Congress adequately expressed its intent to abrogate is answered by the text of the statute. The ADA explicitly provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court . . . for a violation of" the ADA. 42 U.S.C.A. § 12202 (West 1995). This provision unequivocally expresses Congress' intent to abrogate. *See Brown*, 166 F.3d at 705.

C.

We next must decide whether Congress properly exercised its power to abrogate. This inquiry is begun by ascertaining the basis for Congress' abrogation. *See Seminole Tribe*, 517 U.S. at 59. In the ADA, Congress asserted its intent "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment . . . , in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C.A. § 12101(b)(4) (West 1995).[6] Section 5 of the Fourteenth Amendment vests Congress with the authority to abrogate immunity. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) ("[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." (citation omitted)).

Section 5 grants Congress the "power to enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment, including the following portion of § 1:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

---

[6]Congress also relied on its authority "to regulate commerce." *Id.* However, the Interstate Commerce Clause does not provide Congress the power to abrogate Eleventh Amendment immunity. *See Seminole Tribe*, 517 U.S. at 59-66.

U.S. Const. amend. XIV, §§ 1, 5. In exercising its enforcement power, "Congress is not limited to mere legislative repetition of [the Supreme] Court's constitutional jurisprudence." *Garrett*, 531 U.S. at 365. Rather, "§ 5 is a positive grant of legislative power to Congress." *City of Boerne v. Flores*, 521 U.S. 507, 517 (1997) (internal quotation marks omitted); *see id.* at 536 ("It is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." (alteration in original) (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966))). Therefore, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *Id.* at 518.

Congress' § 5 power is not unlimited, however. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000). Section 5 gives Congress the power to enforce the commands of the Fourteenth Amendment, but it does not create in Congress the power to "decree the *substance* of the Fourteenth Amendment's restrictions on the States." *Id.* (internal quotation marks omitted); *see South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966) (describing Congress' § 5 power as "remedial"). Were it otherwise, Congress could not be said to be enforcing the provisions of the Fourteenth Amendment. *See City of Boerne*, 521 U.S. at 519. The distinction between remedy and redefinition is not always easy to draw, and a congressional determination that legislation is needed is entitled to deference. *See id.* at 519-20. Nevertheless, "the distinction exists and must be observed." *Id.* at 520.

The determination of whether Congress has exceeded its § 5 authority—*i.e.*, whether it has crossed the line from remedying constitutional wrongs to defining constitutional rights—rests upon the so-called "congruence and proportionality" test. *See id.* (explaining that in § 5 legislation, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end"). Application of this test proceeds in three steps. *See generally Garrett*, 531 U.S. at 365-74 (applying congruence and proportionality test to Title I of the ADA). First, we must "identify with some precision the scope of the constitutional right at issue." *Id.* at 365. Once we have done so, we then must consider "whether Congress identified a history and pattern of unconstitutional . . . discrimi-

nation by the States." *Id.* at 368. Third, if the congressional record establishes such a pattern, we must determine whether the legislation is congruent and proportional to the identified wrong, *i.e.*, whether it is "responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532. Strict proportionality is not required. "Rather, Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel*, 528 U.S. at 81.

### 1.

We turn first to the scope of the constitutional right at issue. Disabled individuals are not a suspect or quasi-suspect class entitled to special protection under the Equal Protection Clause. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442-47 (1985) (concluding that mentally disabled are not suspect or quasi-suspect class); *Brown*, 166 F.3d at 706 (extending *Cleburne* to all disabled individuals). Therefore, state action affecting the disabled is subject only to rational basis review. Under this standard, state action distinguishing between the disabled and non-disabled is constitutional so long as "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). As the Supreme Court explained in *Garrett*,

> the result of *Cleburne* is that States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational. . . . If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause.

*Garrett*, 531 U.S. at 367-68. In the context of Title II, therefore, the constitutional right may be identified as follows: disabled people have a constitutional right not to be subject to arbitrary or irrational exclusion from the services, programs, or benefits provided by the state.

### 2.

Having defined the scope of the constitutional right at stake, we next must determine whether Congress legislated in light of a history

or pattern of unconstitutional discrimination. We emphasize that our focus is limited to unconstitutional conduct *by the states*, not by local governments, since the latter do not benefit from the protections of the Eleventh Amendment. *See Garrett*, 531 U.S. at 368-69; *see also Kimel*, 528 U.S. at 90-91 (noting that record of discrimination in private sector will not support abrogation). Further, it is not sufficient for Congress to identify a few isolated instances of unconstitutional conduct. Congress must rather identify a pattern of unconstitutional discrimination that is nationwide in its scope. *See Kimel*, 528 U.S. at 90; *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 640-41 (1999).

We note that the Supreme Court has provided very little explicit guidance regarding what materials are relevant in examining the record on which abrogation was based. Additionally, the decisions of the Court are sometimes in tension with each other. *Compare, e.g.*, *Garrett*, 531 U.S. at 370-71 (declining to consider "unexamined, anecdotal accounts" of discrimination presented in testimony to congressionally appointed task force), *with City of Boerne*, 521 U.S. at 530-31 (examining testimony presented in congressional hearings). At the very least, we can be certain that legislative findings enacted as part of the statutory scheme should be considered. *See Garrett*, 531 U.S. at 371. We need not decide whether statements in the congressional record—including committee reports and transcripts of debate on the floors of the House and Senate—also constitute the kind of findings upon which Congress may base abrogation. Even if we assume such materials to be relevant, as we do for purposes of this opinion, the record on which Congress based its decision to abrogate was nevertheless inadequate.

We begin our examination of the record before Congress with the findings included in the ADA. *See* 42 U.S.C.A. § 12101(a) (West 1995). Congress made lengthy findings of discrimination against disabled individuals, some of which specifically concerned the failure to provide access to public services and programs. *See id.* § 12101(a)(3) (noting that "discrimination against individuals with disabilities persists in such critical areas as . . . education, . . . voting, and access to public services"); *id.* § 12101(a)(5) (noting that disabled individuals suffer "the discriminatory effects of . . . relegation to lesser services, programs, activities, [and] benefits"). The mere existence of such

findings is not sufficient to support abrogation, however. *Cf. United States v. Morrison*, 529 U.S. 598, 614 (2000) ("[T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation."). Rather, because the existence of congressional authority to act is ultimately a judicial question, *see id.*, albeit one as to which we owe Congress appropriate deference, we must determine whether Congress' findings were adequate. Here, Congress' general findings are unhelpful in two respects. First, the findings do not identify any particular acts of discrimination by states, much less a pattern of such discrimination. *See Garrett*, 531 U.S. at 369 (observing that, while the record before Congress supported a finding of discrimination against the disabled, "the great majority of these incidents do not deal with the activities of States"). Furthermore, it is not at all clear that Congress' use of the term "discrimination" referred to the sort of arbitrary and irrational behavior that violates the Constitution. *See Thompson v. Colorado*, 278 F.3d 1020, 1033 (10th Cir. 2001), *cert. denied*, 122 S. Ct. 1960 (2002). *But see Dare v. California*, 191 F.3d 1167, 1174 (9th Cir. 1999) (concluding that § 12101(a) contains "specific factual findings of arbitrary and invidious discrimination against the disabled" that constituted a sufficient basis for abrogation).

Neither can we find an adequate record to support abrogation in the official congressional reports concerning the ADA. The reports do contain several examples of unfavorable treatment of disabled people by public entities. *See, e.g.*, H.R. Rep. No. 101-485(II), at 29, *reprinted in* 1990 U.S.C.C.A.N. 303, 311 (quoting testimony of disabled woman who was denied access to public school at age five because the principal deemed her a "fire hazard" (internal quotation marks omitted)); *id.* at 40, 1990 U.S.C.C.A.N. at 322 (quoting testimony regarding failure of village to make town hall accessible to the disabled). Even assuming that these anecdotal reports clearly demonstrate unconstitutional discrimination, the discrimination did not occur at the hands of the state.

The Government argues that, despite the paucity of the official record, Congress was nevertheless aware of many examples of unconstitutional discrimination by the states. In fact, a large portion of the Government's brief is devoted to detailing some of these examples, extracted from hearings regarding the drafting and enactment of the

ADA. Through these examples, the Government presents its best case for abrogation, but it falls short, as the following discussion of the Government's examples illustrates.

The first group of examples offered by the Government concerns access by disabled people to courtrooms, polling places, and public meetings. It is not clear from the Government's brief how many, if any, of these instances involved *state* discrimination.[7] Even assuming that all of the denials of access are attributable to the state, however, it is not clear that a constitutional violation occurred in any of the cited occurrences. For example, many of the complaints by disabled voters concerned their inability to obtain access to polling places, with the result that they were required to vote by absentee ballot. But, it is not necessarily irrational for a state to require disabled voters to submit absentee ballots rather than going to the expense of retrofitting or relocating an established polling place. *See Hooks v. Clark County Sch. Dist.*, 228 F.3d 1036, 1043 (9th Cir. 2000) (noting legitimate state interest in conservation of scarce funds), *cert. denied*, 532 U.S. 971 (2001). The same is true with respect to access to courthouses and public meetings. It may be hardhearted and hardheaded, *see Garrett*, 531 U.S. at 367-68, for the state to refuse to provide special access for the disabled to courtrooms and public meetings. Such a failure is not necessarily unconstitutional, however. For example, in many cases the cost of renovating older buildings will provide a rational basis for failing to create access.

The Government also cites several examples of discrimination in public education, such as inaccurate assignments of students with physical disabilities to classes for the mentally disabled. But, as the Government acknowledges, the vast majority of public primary and secondary education systems are not arms of the state entitled to the protection of the Eleventh Amendment. The Government also details incidents of discrimination by state universities; while many of these examples demonstrate bad conduct, such conduct is not necessarily unconstitutional. *See id.* at 370 (explaining that "adverse, disparate

---

[7]At least some of the cited occurrences clearly do not involve discrimination by the state, such as one case involving a city manager and another involving access to a city hall.

treatment often does not amount to a constitutional violation where rational-basis scrutiny applies" (internal quotation marks omitted)).

The Government also identified acts of discrimination by law enforcement officials. Without exception, all of the examples provided by the Government involved local law enforcement officers, *not* state officials. Additionally, the Government provides a laundry list of examples of failure to provide access to, or discrimination in, "zoning; the operation of zoos, public libraries, public swimming pools and park programs; and child custody proceedings." Br. for the United States as Intervenor at 30-31 (footnotes omitted). Most of these are areas of local, not state, concern; even assuming that some of the Government's examples concerned state activities, none of the cited examples involves demonstrably unconstitutional conduct.[8]

We also find it helpful to examine the list of examples of discrimination cited by the dissent in *Garrett*, *see Garrett*, 531 U.S. at 391-424 (Appendix C to opinion of Breyer, J., dissenting), although the majority determined that these examples could not serve as a basis for abrogation with respect to Title I, *see id.* at 370-71.[9] Of the more than 550 examples cited, only a limited number—perhaps 52 at best—involve potential constitutional violations by an arm of the state with respect to access to public services and programs. Of these 52, 15 involve failures to enforce or comply with laws regarding handicapped parking spaces or access to buildings; it is unlikely that such conduct is unconstitutional. *See Thompson*, 278 F.3d at 1034 ("Apathetic attitudes and refusals to make accommodations do not

---

[8]The Government also relies on laws passed by states at the height of the eugenics movement in the early 1900s, mandating segregation and, in some cases, involuntary sterilization of certain groups of disabled people. As the Court noted in *Garrett*, however, "there is no indication that any State had persisted in requiring such harsh measures as of 1990 when the ADA was adopted." *Garrett*, 531 U.S. at 369 n.6.

[9]The dissent asserts that "the *Garrett* Court specifically found that" the examples in Appendix C "supported abrogation in Titles II and III of the ADA." *Post*, at 19. To the contrary, the Supreme Court simply noted that the vast majority of the claimed acts of discrimination listed in Appendix C were irrelevant to the only question before the Court, namely, the validity of abrogation under Title I of the ADA.

usually violate the Fourteenth Amendment."). Several other examples concern the denial of licenses or admission to programs based upon the application of facially neutral requirements. Again, such conduct is unlikely to be unconstitutional. *See Garrett*, 531 U.S. at 370; *Reickenbacker v. Foster*, 274 F.3d 974, 982 (5th Cir. 2001). Furthermore, we agree with the majority in *Garrett* that the examples in Appendix C are so lacking in detail as to make it impossible to determine whether a constitutional violation actually occurred. *See Garrett*, 531 U.S. at 371 n.7. In view of the fact that the population of America included "some 43,000,000" disabled people when the ADA was enacted, *see* 42 U.S.C.A. § 12101(a)(1), the paucity of examples of even potentially unconstitutional conduct by the states is telling. *See Garrett*, 531 U.S. at 370.

We therefore conclude that Congress did not have an adequate record of unconstitutional discrimination by states against the disabled to support abrogation.[10]

---

[10]The Government argues that even if Congress failed to identify a sufficient number of examples of state discrimination in violation of the Equal Protection Clause, abrogation is nevertheless valid because § 5 also empowers Congress to enact legislation to enforce the guarantees of the Due Process Clause, and "Congress did not need to identify *irrational* government action in order to identify and address *unconstitutional* government action" with respect to due process guarantees. Br. for the United States as Intervenor at 10. Our response to this assertion is two-fold. First, the record before Congress is apparently devoid of examples of state violations of the Due Process Clause—the Government cites, and our research has revealed, none. Second, although the substantive constitutional provisions applied to the states through the Due Process Clause may mandate accommodation of the disabled, *see, e.g.*, *LaFaut v. Smith*, 834 F.2d 389, 392-94 (4th Cir. 1987) (holding that refusal to make minor modifications to prison toilets to accommodate inmate's disability constituted cruel and unusual punishment in violation of Eighth Amendment), "the Due Process Clause does not contain the general mandate found in Title II, which requires accommodations by public entities in all of [their] services, programs, or activities," *Thompson*, 278 F.3d at 1032 (internal quotation marks omitted). *But see Popovich v. Cuyahoga County Ct. of Common Pleas*, 276 F.3d 808, 813-16 (6th Cir. 2002) (en banc) (holding that Congress validly abrogated sovereign immunity as to certain due process claims under Title II of the ADA), *petition for cert. filed*, 70 U.S.L.W. 3656 (U.S. Apr. 10, 2002) (No. 01-1503).

3.

Even if Congress had had before it an adequate record of unconstitutional state conduct, § 5 legislation is valid only insofar as it imposes a prohibition that is congruent and proportional to the violations that Congress sought to prevent or remedy. *See City of Boerne*, 521 U.S. at 520. As we explained above, this requirement may be satisfied by legislation that reaches plainly constitutional conduct, provided "there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." *Id.* at 532.

In *Garrett*, the Supreme Court determined that Title I failed this "congruence and proportionality" test in part because the ADA imposes on states a higher duty of justification than does the Equal Protection Clause:

> [W]hereas it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities, the ADA requires employers to make existing facilities used by employees readily accessible to . . . individuals with disabilities. The ADA does except employers from the reasonable accommodation requirement where the employer can demonstrate that the accommodation would impose an undue hardship . . . . However, even with this exception, the accommodation duty far exceeds what is constitutionally required in that it makes unlawful a range of alternative responses that would be reasonable but would fall short of imposing an undue burden upon the employer. The Act also makes it the employer's duty to prove that it would suffer such a burden, instead of requiring (as the Constitution does) that the complaining party negate reasonable bases for the employer's decision.

*Id.* at 372 (brackets, citation, & internal quotation marks omitted).

This reasoning applies with equal force to Title II, which requires states to make programs and services accessible to the disabled unless providing such access would "fundamentally alter the nature of the

service, program, or activity."**11** 28 C.F.R. § 35.130(b)(7) (2001). For example, it may be entirely rational (and thus constitutional) for a state to refuse to move a polling place to a location that is accessible to the disabled (among other things, the state may be legitimately concerned about confusing voters who are used to voting in a particular location). However, unless the state can prove that moving the polling place would fundamentally alter the service of providing polling places, which is highly doubtful, the state would be required to locate or create accessible polling places for all citizens, irrespective of the inconvenience and expense. Title II thus requires far more than does the Constitution. *See, e.g.*, *Thompson*, 278 F.3d at 1031 ("In contrast to the Equal Protection Clause prohibition on invidious discrimination against the disabled and irrational distinctions between the disabled and the nondisabled, Title II requires public entities to recognize the unique position of the disabled and to make favorable accommodations on their behalf."); *Reickenbacker*, 274 F.3d at 983 ("Title II indisputably embodies more than merely a prohibition on unconstitutional discrimination against the disabled."); *cf. Brown*, 166 F.3d at 707 (concluding that regulation prohibiting surcharges sought "to redefine the Equal Protection Clause" by creating "a positive entitlement to a free handicapped parking space").

D.

In sum, we conclude that Congress did not validly abrogate the sovereign immunity of the states when it enacted Part A of Title II of the ADA. Although Congress properly and clearly expressed its intent to do so, it acted on the basis of an inadequate record and imposed a remedy that is neither congruent nor proportional to the problem it identified. In reaching this holding, we join the majority of our sister

---

**11**The dissent asserts that because the requirements of Title II are satisfied when a state makes its services, programs, and activities accessible, the burden imposed by Title II on states is less than that imposed by Title I and, therefore, the reasoning of *Garrett* is not applicable. We disagree. The mere fact that some accommodations may be accomplished at little or no cost to the state—for example, by relocating a class from the second to the first floor of a building without an elevator—does not establish that, as a whole, Title II requires little more of the states than does the Constitution.

circuit courts. *See Garcia v. SUNY Health Scis. Ctr.*, 280 F.3d 98, 112 (2d Cir. 2001) (holding that Title II exceeds Congress' authority under § 5 to the extent that it authorizes suits against states when there is no evidence of "discriminatory animus or ill will due to disability"); *Popovich v. Cuyahoga County Ct. of Common Pleas*, 276 F.3d 808, 812-16 (6th Cir. 2002) (en banc) (holding abrogation invalid as to equal protection, but not due process, claims), *petition for cert. filed*, 70 U.S.L.W. 3656 (U.S. Apr. 10, 2002) (No. 01-1503); *Thompson*, 278 F.3d at 1030-34 (holding abrogation invalid); *Reickenbacker*, 274 F.3d at 981-83 (same); *Walker v. Snyder*, 213 F.3d 344, 346-47 (7th Cir. 2000) (same); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005-10 (8th Cir. 1999) (en banc) (same). Only one circuit, in a case decided before *Garrett*, has squarely held to the contrary. *See Dare*, 191 F.3d at 1173-75.[12]

### III.

For the reasons set forth above, we conclude that the district court correctly dismissed Wessel's claim under Part A of Title II of the ADA. Accordingly, we affirm.

*AFFIRMED*

KING, Circuit Judge, dissenting:

Because I believe that Congress successfully abrogated state sover-

---

[12]The Government makes much of the fact that the Supreme Court denied certiorari in *Dare* mere days after its decision in *Garrett*. However, the Court denied certiorari in *Walker* on the same day.

In dictum in a pre-*Garrett* decision, the First Circuit stated that, when faced with the question, it "almost certainly" would uphold the abrogation of immunity in Title II. *Torres v. P.R. Tourism Co.*, 175 F.3d 1, 6 n.7 (1st Cir. 1999). More recently, the First Circuit has held "that Congress acted within its powers in subjecting the states to private suit under Title II of the ADA, at least as that Title is applied to cases in which a court identifies a constitutional violation by the state." *Kiman v. N.H. Dep't of Corr.*, ___ F.3d ___, 2002 WL 1880377, at *10 (1st Cir. Aug. 20, 2002). The court declined to consider the validity of abrogation beyond the particular application of the ADA at issue. *See id.* at *6-*8.

eign immunity when it enacted Title II of the ADA, I must dissent. My primary disagreement with my friends in the majority relates both to their refusal to give proper credit to specific record evidence of discrimination by state entities in public programs, and to their denial to Congress of the deference due when our elected representatives make general findings of fact in support of legislation. Furthermore, the majority mistakenly asserts that, because Title II reaches certain constitutional conduct, the ADA's abrogation of immunity must be unsuccessful. Though the majority gives lip service to the notion that § 5 of the Fourteenth Amendment does not require that Congress tailor its legislative remedies with surgical precision, the effect of its decision is to demand just that. I will elaborate briefly on each of these points of disagreement.

I.

The Supreme Court held last year, in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), that Congress exceeded its enforcement authority under § 5 of the Fourteenth Amendment when it sought to abrogate state sovereign immunity in Title I of the ADA, 42 U.S.C. §§ 12111-12117 (addressing discrimination by employers affecting interstate commerce). In so holding, the *Garrett* Court observed that the legislative record of the ADA "fails to show that Congress did in fact identify a pattern of irrational state discrimination *in employment* against the disabled." 531 U.S. at 368 (emphasis added). Of significance here, the Court's *Garrett* decision expressly reserved the question of whether Title II, 42 U.S.C. §§ 12131-12165 (addressing discrimination by public entities in the operation of public services), is appropriate legislation under § 5 of the Fourteenth Amendment. *Id.* at 360 n.1. The legislative record before us in support of Title II's abrogation of state sovereign immunity is far stronger than that found wanting by the *Garrett* Court. Given the strength of this record, a modicum of respect for the workings of the legislative branch of government should prompt us to conclude that Congress's findings in support of Title II abrogation were sufficient.

## A.

### 1.

The *Garrett* Court found that Congress had failed to identify a sufficient "pattern" of unconstitutional discrimination to support its § 5 abrogation of state sovereign immunity in Title I of the ADA. *See, e.g.*, *Garrett*, 531 U.S. at 370 ("[E]ven if it were to be determined that each [record] incident upon fuller examination showed unconstitutional action on the part of the State, these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based."). While the legislative record supporting Title I failed to establish a pattern of unconstitutional discrimination by the states, no such deficiency exists in the record supporting Title II.

The congressional record supporting abrogation under Title II of the ADA contains abundant evidence of specific acts of unconstitutional state discrimination against the disabled in the operation of public programs. As Justice Breyer observed in his *Garrett* dissent, "[t]here are roughly 300 examples of discrimination by state governments themselves in the legislative record [of the ADA]." *Garrett*, 531 U.S. at 379 (Breyer, J., dissenting). And according to the *Garrett* majority itself, "[t]he overwhelming majority of these accounts pertain to alleged discrimination *by the States in the provision of public services* and public accommodations, which areas are addressed in Titles II and III of the ADA." *Garrett*, 531 U.S. at 370 n.7 (emphasis added) (Rehnquist, C.J.). In other words, the *Garrett* Court specifically found that the overwhelming majority of Congress's specific evidence of discrimination failed to uphold the Title I abrogation simply because it supported abrogation in Titles II and III of the ADA instead.[1]

---

[1]The majority insists that "the Supreme Court simply noted that the vast majority of the claimed acts of discrimination listed in Appendix C were irrelevant to the only question before the Court, namely, the validity of abrogation under Title I of the ADA." *Ante* at 13 n.9. This is incorrect. In light of the fact that the Chief Justice stated baldly that the evidence in Appendix C "pertain[s] to alleged discrimination by the States in the . . . areas . . . addressed in Titles II and III of the ADA," *Garrett*, 531 U.S. at 370 n.7, the majority's suggestion that the Court confined its discussion to Title I is mistaken.

The congressional record supporting abrogation under Title II is stronger still by virtue of the fact that Title II implicates constitutional rights that trigger heightened judicial scrutiny. While Title I dealt only with employment discrimination, Title II addresses discrimination implicating, *inter alia*, parental rights, voting rights, and the Eighth Amendment right against cruel and unusual punishment.[2] Whereas a state is constitutionally entitled to engage in "rational" employment discrimination on the basis of disability, a state's infringement of a disabled person's parental, voting, or Eighth Amendment rights is subjected to more searching scrutiny.

Instances in which states denied to the disabled certain fundamental rights are recounted throughout the legislative record underlying Title II. Held to the appropriate, higher levels of scrutiny, such discrimination is clearly unconstitutional. For instance, Congress heard that a blind voter with cerebral palsy was arbitrarily refused the right to register to vote in state elections. Staff of the House Comm. on Educ. and Labor, 101st Cong., 2d Sess., 2 *Legis. Hist. of Pub. L. No. 101-336: The Americans with Disabilities Act* 1220, 100th Cong., 2d Sess. (Comm. Print 1990) [hereinafter "*Leg. Hist.*"]. It heard that a blind woman was refused instructions on how to use her state's voting machines. Task Force on the Rights and Empowerment of Americans with Disabilities, *Alabama Submissions* 16.[3] It heard that state mental hospitals misuse medications to punish and restrain their disabled, institutionalized patients. 2 *Leg. Hist.* 1203, 1262-63. And it heard that such hospitals subject their patients to abusive treatment and inhumane conditions.[4] *Id.* Replete with such evidence of unconstitu-

---

[2]*See, e.g.*, *Popovich v. Cuyahoga County Ct. of Common Pleas*, 276 F.3d 808, 813 (6th Cir. 2002) (en banc) (upholding Title II as applied in a case involving parental rights); *id.* at 820 (Moore, J., concurring) (discussing the implication of voting rights); *Kiman v. N.H. Dep't of Corrs.*, ___ F.3d ___, No. 02-1099 (1st Cir. Aug. 20, 2002) (upholding Title II as applied in a case involving cruel and unusual punishment).

[3]The Task Force's state-by-state submissions, evincing discrimination in all aspects of the lives of the disabled, 2 *Leg. Hist.* 1324-25, are part of the official legislative history of the ADA, *see id.* at 1336, 1389.

[4]The Supreme Court held in *Youngberg v. Romeo*, 457 U.S. 307 (1982), that there are constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment in reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably might be required by these interests.

tional state discrimination, the congressional record underlying Title II of the ADA provides more than adequate support for Congress's abrogation of state sovereign immunity under § 5 of the Fourteenth Amendment.

2.

In addition to amassing specific evidence in support of the Title II abrogation, Congress made an express general finding that the states had engaged in a pattern of unconstitutional discrimination in the operation of public services. In rejecting Congress's Title I abrogation, the *Garrett* Court relied heavily on the fact that Congress's record failed to conclude that state employment practices demonstrated a pattern of discrimination against the disabled. Relying on Senate and House committee reports as indicative of Congress's judgment regarding general patterns of discrimination, Chief Justice Rehnquist explained that "had Congress truly understood [the evidence] as reflecting a pattern of unconstitutional behavior by the States, one would expect some mention of that conclusion in the Act's legislative findings. There is none." *Garrett*, 531 U.S. at 370-72. Strikingly, there *is* such a finding with respect to the public services governed by Title II. The very Senate report relied upon by the Chief Justice concluded that "[d]iscrimination still persists in such critical areas as employment in the private sector, public accommodations, *public services*, transportation, and telecommunications." S. Rep. No. 101-116, p. 6 (1989) (emphasis added); *see Garrett*, 531 U.S. at 371. And the House report on which Chief Justice Rehnquist relied reached the same conclusion: "After extensive review and analysis over a number of Congressional sessions, . . . [we find that] there exists a compelling need to establish a clear and comprehensive Federal prohibition of discrimination on the basis of disability in the areas of employment in the private sector, public accommodations, *public services*, transportation, and telecommunications." H.R. Rep. No. 101-485, pt. 2, p. 28 (1990) (emphasis added); *see Garrett*, 531 U.S. at 371.

Thus, while Congress made no mention at all of the public sector in its finding of persistent employment discrimination, it expressly concluded that there existed a pattern of discrimination in public services for Congress to remedy through § 5 abrogation of state sover-

eign immunity. Given that the *Garrett* majority characterized Congress's failure to make a general finding of public sector employment discrimination as "strong evidence" of "that body's judgment that no pattern of unconstitutional state action had been documented," *Garrett*, 531 U.S. at 371, we must take Congress's finding of public services discrimination as compelling evidence of its judgment that a pattern of unconstitutional conduct *was* documented for Title II.

B.

Both Congress's specific findings and its general conclusion of rampant discrimination in public services should satisfy this Court that our elected representatives did indeed identify a pattern of unconstitutional state action that justified abrogation of state sovereign immunity with respect to Title II of the ADA. Instead, the majority transforms what is properly a factual question within Congress's purview into a legal question for this Court's determination. And beyond merely trespassing on Congress's proper fact-finding role, the majority establishes and applies a standard of review that even a detailed legislative record could not possibly satisfy. It is, in my view, inappropriate for the unelected judiciary to so interfere with a coequal branch of government.

The Supreme Court has recognized that "Congress may paint with a much broader brush than may this Court, which must confine itself to the judicial function of deciding individual cases and controversies upon individual records." *Oregon v. Mitchell*, 400 U.S. 112, 284 (1970) (Stewart, J., concurring in part and dissenting in part). It is uniquely Congress's role to draw general conclusions from anecdotal evidence gathered from a broad swath of the population, and its design — unlike that of the federal courts — suits it for this function. Accordingly, the federal courts are not then to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations." *Heller v. Doe*, 509 U.S. 312, 319 (1993) (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam)); *see also FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993) (emphasizing that it is not for the courts "to judge the wisdom, fairness, or logic of legislative choices"). Congress's judgment that a pattern of state discrimination persists, and that such discrimination requires a federal remedy, is entitled to "a great deal of deference,

inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 331 n.12 (1985).

In the § 5 context, the Supreme Court has specifically admonished that "[i]t [i]s for Congress . . . to assess and weigh the various conflicting considerations — the risk or pervasiveness of the discrimination in governmental services, . . . the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected. . . . It is not for us to review the congressional resolution of these factors." *Katzenbach v. Morgan*, 384 U.S. 641, 653 (1966); *see also Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 639 (1999) (stating that "Congress must have wide latitude") (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)); *City of Boerne*, 521 U.S. at 528, 536 (reaffirming *Morgan* and adding that Congress's "conclusions are entitled to much deference"). Rather, "[i]t is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did." *Morgan*, 384 U.S. at 653; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985) ("[C]ourts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices [under § 5 of the Fourteenth Amendment].").

Our deference to Congress's assessment of the problems facing this nation is particularly appropriate when the problems are those of a "large and diversified group," such as the disabled. *See Cleburne*, 473 U.S. at 442. Addressing discrimination against the disabled, as Congress did in the ADA, "is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." *Id.* at 442-43. The drafting of the ADA is itself a case study in the sort of exhaustive, nationwide fact-finding for which Congress is uniquely suited.[5]

---

[5]In its development of the ADA, Congress created a special task force, which conducted public hearings in every state. Those hearings were attended by more than 30,000 people, including thousands who had experienced discrimination first hand. *See* Task Force on the Rights and Empowerment of Americans with Disabilities, *From ADA to Empower-*

In view of the substantiality of the Title II record showing unconstitutional state discrimination, a modicum of respect for Congress should compel the conclusion that Congress built a record adequate to support abrogation of sovereign immunity in Title II of the ADA.

## II.

The majority also maintains, in support of its conclusion that Congress did not validly abrogate immunity under Title II, that "[e]ven if Congress had had before it an adequate record of unconstitutional state conduct," the Title II abrogation would be improper because it "impose[s] a remedy that is neither congruent nor proportional to the problem [Congress] identified." *Ante* at 15, 16 (citing *City of Boerne*, 521 U.S. at 520). The majority's interpretation of congruence and proportionality in effect requires that Congress's remedy be a perfect fit, prohibiting only such conduct as is itself unconstitutional. The Supreme Court, though, has repeatedly recognized that such precision in statutory tailoring is not required when Congress legislates under § 5 of the Fourteenth Amendment.

## A.

Title II of the ADA mandates that a state make "reasonable modifications" to its policies and practices to accommodate the disabled. 42 U.S.C. § 12131(2). The majority contends that this requirement lacks the congruence and proportionality required of legislation under § 5 of the Fourteenth Amendment. *Ante* at 15-16. It takes as its example the possibility that, under the ADA, a state might "be required to locate or create accessible polling places for all citizens, irrespective of inconvenience and expense." *Ante* at 16. While I would dispute the

*ment* 16 (Oct. 12, 1990) (hereinafter Task Force Report). The House of Representatives held eleven hearings, the Senate held three, and both houses of Congress engaged in lengthy floor debates. *See* Timothy M. Cook, *The Americans with Disabilities Act: The Move to Integration*, 64 Temp. L. Rev. 393, 393-94 (1991) (summarizing the fact-finding process that preceded passage of the ADA). Only upon conclusion of this thorough process did Congress pass the Americans with Disabilities Act of 1990, which the first President Bush then signed into law.

majority's characterization of what the ADA requires,[6] the majority is nonetheless correct that certain discriminatory state action may be unreasonable under the ADA, and yet constitutional. That fact, though, does not render Title II's abrogation of sovereign immunity improper.

As the majority concedes, the "congruence and proportionality" requirement of § 5 may be satisfied by legislation that reaches plainly constitutional conduct, provided that "there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." *City of Boerne*, 521 U.S. at 532. *Ante* at 15. The Supreme Court has held that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' [§ 5] enforcement power *even if in the process it prohibits conduct which is not itself unconstitutional . . . .*" *Florida Prepaid*, 527 U.S. at 638 (1999) (quoting *City of*

---

[6]By positing that the state's obligation exists "irrespective of inconvenience and expense," the majority indulges an alarmist statutory interpretation, indicating that it overestimates the degree to which Title II's requirements reach beyond those imposed by the Constitution. Title II does not require that a state make accommodations irrespective of inconvenience and expense. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603-04 (1999) (holding that a state may take into account cost and available resources in determining whether and how to accommodate the disabled under Title II). Furthermore, Title II's requirement that public entities make "reasonable modifications" to accommodate the disabled, 42 U.S.C. § 12131(2), obliges states only to make their *programs* accessible. 28 C.F.R. § 35.150(b)(1) (stating that when existing facilities are inaccessible, a public entity "is not required to make structural changes," so long as it makes its programs available to the disabled in some other manner); *see also Anderson v. Pa. Dep't of Pub. Welfare*, 1 F. Supp. 2d 456, 464 ("The overall policy of [Title II of] the ADA is to require relatively few changes to existing buildings . . . ." (citation omitted)). Thus, far from requiring that the state "locate or create accessible polling places for all citizens, irrespective of inconvenience and expense," as the majority fears, *ante* at 16, Title II apparently demands nothing more than provision of an absentee ballot alternative. *Cf. Dipietrae v. City of Phila.*, 666 A.2d 1132 (Pa. Commw.), *aff'd*, 673 A.2d 905 (Pa. 1995) (discussing absentee ballots as an ADA-satisfying option for disabled voters who cannot go to the polls).

*Boerne*, 521 U.S. at 518) (emphasis added); *cf. Morgan*, 383 U.S. at 324 (interpreting the similarly worded Enforcement Clause of the Fifteenth Amendment to permit Congress to use "any rational means to effectuate the constitutional prohibition"). Under Supreme Court precedent, § 5 legislation is appropriately "congruent and proportional" if it is "responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532.

Title II is both responsive to and designed to prevent a congressionally identified pattern of constitutional violations in the operation of public programs. By requiring "reasonable modifications" in policies and practices, Title II charges the states with an affirmative duty to address the sources of discrimination against the disabled in the operation of their public programs. *Cf. Green v. County Sch. Bd.*, 391 U.S. 430, 437-38 (1968) (stating that after unconstitutional segregation, government is "charged with the affirmative duty to take whatever steps might be necessary" to eliminate discrimination). Congress could reasonably have concluded that a statutory regime that reaches certain constitutional conduct is necessary both to root out unconstitutional conduct that would otherwise escape detection, and to deter future constitutional violations.

B.

While the *Garrett* Court indicated in dicta that the breadth of rights and remedies created under Title I "would raise . . . concerns about congruence and proportionality," *Garrett*, 531 U.S. at 372, Title II averts such concerns by departing from Title I in two important respects: first, Title II requires more limited accommodation of the disabled; and second, it targets discrimination by public entities acting not as employers, but rather as sovereigns. As explained below, due to these two distinctions, Title II interferes with "rational" (and therefore constitutional) discrimination against the disabled to a lesser degree than did Title I. Accordingly, the remedy that Title II provides is more closely tailored to its goal of eliminating unconstitutional discrimination than was the remedy under Title I, and its § 5 abrogation is entirely proper. I address these distinctions in turn.

1.

Whereas Title I expressly requires modification of existing, inaccessible facilities to accommodate the disabled, *see* 42 U.S.C. § 12112(b)(5)(A); *Garrett*, 521 U.S. at 372, Title II does not. Rather, Title II requires only that public entities make their *programs* accessible. 42 U.S.C. § 12132. This requirement is satisfied if, for instance, a state offers a program in an alternate setting to individuals who are unable to use an existing facility. 28 C.F.R. § 35.150(b)(1); *see Anderson v. Pa. Dep't of Pub. Welfare*, 1 F. Supp. 2d 456, 464 ("The overall policy of [Title II of] the ADA is to require relatively few changes to existing buildings . . . ." (citation omitted)). As a result, Title II requires that the states make fewer affirmative accommodations than did Title I; and the prophylactic scope of Title II imposes a minimal burden because, as Congress found, the vast majority of the those accommodations entail little or no cost.[7] By demanding that the states make fewer and less burdensome accommodations, Title II interferes in constitutional state discrimination against the disabled to a lesser degree than did Title I.[8]

2.

In finding that Congress did not validly abrogate sovereign immunity in Title I, the *Garrett* Court emphasized that Title I requires that

---

[7]*See* S. Rep. No. 116, 101st Cong., 1st Sess., 10-12, 89, 92 (1989); H.R. Rep. No. 485, 101st Cong., 2d Sess., Pt. 2, at 34 (1990).

[8]The majority responds to this argument by stating that "the mere fact that some accommodations may be accomplished at little or no cost . . . does not establish that, as a whole, Title II requires little more of the states than does the Constitution." *Ante* at 16 n.11. Clearly not. What it does establish, though, is that, by both imposing fewer costs and demanding fewer accommodations, Title II raises fewer congruence and proportionality concerns than did Title I. *See City of Boerne*, 521 U.S. at 534 (congruence and proportionality concerns are most acute when statutory compliance entails "substantial costs" that "far exceed any pattern or practice of unconstitutional conduct"); *Garrett*, 531 U.S. at 372 (noting that congruence and proportionality is of particular concern under Title I because "the [Title I] accommodation duty far exceeds what is constitutionally required").

employers make existing facilities accessible to the disabled, even though "it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities." *Garrett*, 531 U.S. at 372. The Supreme Court has held, though, that while a state has a "significant" interest in conserving resources and achieving its goals as effectively and efficiently as possible when it acts as an employer, that same interest in efficiency is "relatively subordinate" when the state acts in its sovereign capacity by, for instance, operating public programs. *See Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 676 (1996). As a result, the scope of a state's legitimate interest in maximizing efficiency in the operation of its public programs is narrower than the scope of its legitimate interest in maximizing efficiency as an employer. Since Title II — with remedial provisions no broader than those of Title I — addresses discrimination by states in their operation of public programs, whereas Title I addressed discrimination by states acting as employers, Title II necessarily intrudes less on the states' rational pursuit of legitimate interests. Hence, Title II interferes in constitutional state discrimination against the disabled to a lesser degree than did Title I.

## C.

Even though Title II reaches certain constitutional conduct, it constitutes a rational effort to remedy and deter identified constitutional violations, and it is an effort that is better tailored to address unconstitutional conduct than was Title I. Unless we intend to demand a perfect statutory fit, rather than the "congruence and proportionality" required by the Supreme Court, Title II's abrogation of state sovereign immunity remains well within Congress's § 5 authority.

## III.

For the foregoing reasons, I see Title II's abrogation of sovereign immunity as passing constitutional muster. I respectfully dissent.